Filed 8/4/23  Richardson Investments v. Hajj CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RICHARDSON INVESTMENTS, LLC, | |
| Plaintiff and Respondent, | E078098 |
| v. | (Super.Ct.No. PSC1806316) |
| KATIA HAJJ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kira L. Klatchko, Judge.
Affirmed.

JDM and James D. Menke for Defendant and Appellant.

Messina & Hankin and David A. Grabhorn for Plaintiff and Respondent.

Defendant and appellant Katia Hajj (Hajj) contracted to sell a vacant lot in

Palm Springs to plaintiff and respondent Richardson Investments, LLC, (Richardson) for

$110,000.  Hajj failed to complete the sale, and Richardson initiated this action seeking,

inter alia, rescission of the contract, return of the deposit, restitution, and damages.  The

1

case was tried to the court, which found that Hajj "breached the Agreement and that [Richardson] was entitled to and did rescind the Agreement." The trial court entered judgment for Richardson; as the prevailing party, Richardson was awarded costs and reasonable attorney fees.

On appeal, Hajj challenges the sufficiency of evidence to support the judgment. She further contends the trial court erred in failing to make several findings as to specified issues of material fact and in awarding attorney fees in the amount of $165,637.50. We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

On June 26, 2018, Richardson and Hajj entered into a valid contract for Richardson's purchase of Hajj's vacant lot in Palm Springs for $110,000 cash, with $10,000 deposited into escrow (the agreement). Richardson intended to commercially develop the land in conjunction with its adjacent lot already acquired for that purpose. The agreement and escrow instructions provided for the close of escrow on August 13, 2018, when the escrow holder had obtained title insurance. When the insurance was not obtained by August 13, Hajj considered the agreement null and void. On September 12, the insurance was arranged; however, Hajj refused to execute the remaining documents necessary to close escrow and repudiated all contractual obligations. On September 27, Richardson served Hajj with a formal notice to seller to perform; Hajj refused.

On October 16, 2018, Richardson initiated this action (initially seeking specific performance) and recorded a lis pendens on the property. Richardson attempted mediation (as required by the contract) and arbitration; Hajj refused. After more than a

2

year of litigation, and after Richardson's business purpose for joint development of the two lots was completely frustrated due to the death of Charles Richardson[1] (Charles aka Chick), Richardson filed the operative second amended complaint changing its election of remedies from specific performance to rescission and restitution.

   *A. The Evidence.*

   A three-day bench trial was conducted virtually in June 2021. There were four witnesses: Elicia Richardson-Ellis (Charles's daughter and heir; Elicia); Hajj; Melvena Schaefer (the escrow officer; Schaefer); and Antoine Abi-Abdallah (Hajj's spouse; Abi-Abdallah).[2]

      1. Elicia's testimony.

   Elicia is Charles's daughter and heir. She is the president, secretary, and sole manager of Richardson, a Texas limited liability company. Between 2015 and December 16, 2019, Richardson was owned by the Charles C. Richardson Revocable Trust (the trust). Elicia is also the president, secretary, and sole manager of CRE, LLC, a Texas limited liability company (CRE), another company owned by the trust.

   Richardson obtained its operating funds from the trust's account. From August 13 through October 19, 2018, Charles would determine the amount of money to transfer from the trust to Richardson. He had the sole discretion to do so. For the money needed

---

   [1] We refer to the Richardson family members by their first names to avoid confusion. We mean no disrespect in doing so. (*Estate of O'Connor* (2018) 26 Cal.App.5th 871, 875, fn. 2.)

   [2] Hajj's husband also used the name "Tony."

to purchase Hajj's property, Charles planned to take it from the trust, which had sufficient funds. During August 2018, the total amount of cash assets available in the trust was at least $1,026,083.68. On August 6, 2018, Charles transferred $100,000 from the trust to CRE. As of September 12, 2018, the trust's total amount of cash assets was approximately $2,189,179.71. In October 2018, the trust's total amount of cash assets was $2,278,110.88.

### 2. Hajj's testimony.

Hajj's personal representative was her spouse, Abi-Abdallah, who acted on her authority and communicated directly with the real estate agent (James Stuart)[3] and the escrow officer. Escrow did not close on August 13, 2018, because title insurance had not been secured. Upon securing title insurance, on September 17, 2018, escrow sent documents to Hajj for her signature. She knew that she needed to execute these documents to close escrow, but she refused to do so because (1) the interspousal transfer grant deed incorrectly identified her husband's name as Tony Hajj, and (2) she, through her husband, declared that Richardson was in breach and the contract was "null and void."

According to the agreement, neither party could cancel the contract without first demanding that the other party close escrow. Between August 13 and October 16, 2018, Hajj never made such demand nor provided written notice of cancellation. On September 27, Richardson served her with a written demand to close escrow. She failed to do so,

---

[3] Mr. Stewart represented both Hajj and Richardson.

and Richardson served her with the complaint and notice of lis pendens.  Hajj never told her husband to contact the escrow officer to complete the sale.

### 3. Schaefer's testimony.

Schaefer, president and senior escrow officer at Liberty Escrow, was in charge of the escrow for the sale of Hajj's property to Richardson.  Escrow opened on June 27, 2018, and Schaefer opened a preliminary title report with Orange Coast Title Company (OCT) with instructions to order title insurance at the closing; she could not close escrow without a policy of title insurance.  Schaefer also prepared a grant deed identifying the seller as "Katia Hajj, a married woman," and sent it to OCT on July 23, 2018.

For title insurance, the underwriter demanded copies of public records concerning the tax sale from which Hajj acquired the property.  On August 2, 2018, Schaefer requested these records from Riverside County's Office of the Treasurer-Tax Collector tax sales department, but OCT did not receive them until September 6.  The first day that OCT informed Schaefer that it would provide a title insurance policy was September 12; however, it required Schaefer to obtain a quitclaim deed or an interspousal deed from Hajj's husband since Hajj held the title as a married woman.  Without the interspousal transfer grant deed executed by Abi-Abdallah, OCT refused to provide insurance.

In September 2018, when Schaefer contacted Hajj and Abi-Abdallah to obtain the necessary documents, she was told that Hajj intended to cancel the escrow.  However, since Hajj never took any action to cancel the escrow, Schaefer continued to work on satisfying all the conditions necessary to close.  She prepared the interspousal transfer grant deed using the name, Tony Hajj, as the grantee because she was unaware that Hajj's

5

husband had a different last name. On September 17, 2018, Schaefer sent a cover letter to Hajj that included the interspousal transfer grant deed and amended escrow instructions. The cover letter instructed Hajj to call if she had any questions; Hajj never called. The amended instructions provided that Richardson was assigning its right, title, interest, and obligation in and to the escrow to CRE, the buyer, and entity in which title would vest.[4] According to Schaefer, after August 18, 2018, Hajj never cooperated in any efforts to close escrow, and Abi-Abdallah told Schaefer that they (Hajj and Abi-Abdallah) did not want to cooperate, and Hajj refused to perform.

On September 27, 2018, Charles emailed Schaefer about the anticipated closing statement and requested wiring instructions so he could deposit $100,000 into escrow.[5] In response, she suggested that he not deposit the funds in escrow until "we have all the documents from the Seller and the title company has approved them. Once your funds are in escrow, if we are not able to close because of missing documents or anything else, we would not be able to release the money back to you without mutually agreed instruction from you AND the seller." Schaefer testified that they "don't request funds to be deposited in escrow unless we're in a position to close."

---

[4] As previously stated, on August 6, 2018, Charles transferred $100,000 from the trust to CRE.

[5] "Melvena, [¶] RE: APN 666-402-004 [¶] Please forward me the anticipated closing statement and the wiring instructions for the above referenced property. I anticipate the seller will be giving you the documents you have requested from her so we can close. Additionally I believe you said you now have the new title report, (Prelim). Have you sent that to me for my approval, if not please do so, as I do not want any further delays on this escrow. If I have anything incorrectly stated here please contact me as soon as possible. [¶] Thank you. [¶] Chick."

4. Abi-Abdallah's testimony.

Real estate agent James Stuart initially contacted Abi-Abdallah and proposed a sale of his wife's vacant lot in Palm Springs. A contract to sell the property to Richardson was entered into, and Abi-Abdallah acted as Hajj's "agent in all dealings with this transaction." On June 27, 2018, escrow opened with Liberty Escrow, and Schaefer was the escrow officer. On August 13, the official date that escrow was to close, Abi-Abdallah called Schaefer to find out the "status of the agreement to make sure that the deal went through." Otherwise, he had one other direct communication with Schaefer "sometime in November of 2018" when he sought a legible copy of the agreement.

Abi-Abdallah received Schaefer's September 17, 2018 letter but had an issue with the interspousal transfer grant deed because it did not have his correct name. He never called Schaefer to tell her that his name on the deed was wrong. Rather, he told Stuart that the name on the interspousal transfer grant deed was incorrect, and he (Abi-Abdallah) could not sign it; Stuart started yelling and threatening to sue. On or about September 27, Abi-Abdallah received the notice to seller to perform but never discussed it with Stuart or Schaefer. On October 20, Abi-Abdallah received the lis pendens. Four days later, he received a letter with an offer to mediate the issue with Al Wenzell. In response, Abi-Abdallah spoke with Wenzel, explaining the status of the case and telling him that "they are not willing to finish the agreement." He (Abi-Abdallah) also told Wenzel that "Hajj and [he] were prepared to close escrow" under the original terms.

On or about November 16, 2018, Abi-Abdallah spoke with Richardson's attorney and told him that they (Hajj and Abi-Abdallah) were prepared to close escrow. He also

7

said that Hajj would participate in arbitration. Abi-Abdallah testified that "at all times from September 17 and onward," he and Hajj remained "ready, willing, and able to close the escrow." However, he stated that Richardson never provided "any verification of funds," never removed "any contingencies as specified in sections 19A and B of the contract," and never signed the amended escrow instructions. He further added that Hajj had incurred attorney fees in this case. On cross-examination, he denied declaring, or telling anyone, after August 13, 2018, that the contract was null and void.

### B.  *The Judgment.*

The trial court concluded that Hajj materially breached the agreement (by failing to tender marketable title at the time the contract matured) and failed to comply with escrow's reasonable and appropriate demands, thereby excusing further performance by Richardson and entitling it to rescind and recover its deposit. The court specifically found Schaefer's testimony was credible but not that of Hajj or Abi-Abdallah. It ruled that Richardson is entitled to its $10,000 deposit, along with costs and reasonable attorney fees as the prevailing party.

Hajj filed and served a request for a written statement of decision specifying 34 allegedly controverted issues,[6] most of which the trial court declined to address because they raised subsidiary issues or sought evidentiary findings. After the court issued its proposed statement of decision, Hajj lodged seven objections on the grounds the statement of decision (1) fails to make a finding as to when each party's performance

---

[6]  The superior court clerk was unable to locate this document but "a receive and forward entry" was noted in the case management system.

was due; (2) fails to make a finding as to whether Richardson was ready, willing, and able to perform; (3) fails to make a finding as to when Hajj anticipatorily breached the contract and repudiated; (4) fails to make a finding as to whether Hajj retracted her repudiation and, if she did, whether the retraction occurred before performance was due; (5) fails to make a finding as to whether Hajj breached the agreement; (6) fails to state the factual and legal basis for the conclusion that Hajj failed to deliver marketable title; and (7) is inconsistent "in that it finds that [Richardson] had the power to obtain its deposit funds by serving the required notices and terminating escrow but that it did not do so but also concludes that [Richardson's] unilateral rescission of the Agreement was effective." The proposed statement of decision became final without change.

On September 29, 2021, judgment was entered for Richardson, which was adjudged to be the prevailing party entitled to recover reasonable attorney fees and costs pursuant to the agreement.

### C. *The Award of Attorney Fees.*

On October 25, 2021, Richardson moved for its attorney fees and costs pursuant to Civil Code section 1717. In support of the fees incurred, Richardson submitted its counsel's (David A. Grabhorn (Grabhorn)) declaration, which attached the retainer agreement and a compilation of Grabhorn's daily time entries of actions taken in the litigation. Hajj opposed the motion. On January 25, 2022, the trial court granted the motion and awarded $165,637.50 in attorney fees and $3,843.22 in costs.

9

## II. DISCUSSION

Hajj presents three issues on appeal: (1) "Whether the Trial Court committed reversible error by failing to make several necessary findings as to specified issues of material fact"; (2) "Whether the evidence supports the Judgment"; and (3) "Whether the Trial Court committed reversible error by awarding of attorney's fees in the amount of $165,637.50."

### A. *Guiding Principles for the Statement of Decision.*

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.]

"A single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation.] 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' [Citation.]

"When a proper request for a statement of decision has been made, the scope of appellate review may be affected. [Citation.] Under [Code of Civil Procedure]

10

section 632, upon a party's request after trial, the court must issue a statement of decision 'explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial.' And under [Code of Civil Procedure] section 634, if the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' [Citations.]

"The statutory statement of decision process following '"the trial of a question of fact by the court" . . . [¶] . . . "is for the benefit of the court and the parties. To the court it gives an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests. To the parties, it furnishes the means, in many instances, of having their cause reviewed without great expense."' [Citation.] A proper statement of decision is thus essential to effective appellate review. 'Without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule,' as we would have no means of ascertaining the trial court's reasoning or determining whether its findings on disputed factual issues support the judgment as a matter of law. [Citation.]

"Together, [Code of Civil Procedure] sections 632 and 634, as implemented by rule 3.1590(d)–(g) of the California Rules of Court, establish a two-step procedure for requesting a statement of decision and preserving objections for pursuit on appeal. First, following the court's announcement of its tentative decision, [Code of Civil Procedure]

11

section 632 requires a party to specify, in timely fashion and in proper form, 'those controverted issues as to which the party is requesting a statement of decision. After a party has requested the statement, any party may make proposals as to the content of the statement of decision.' This initial step serves the function of advising the trial court of exactly what issues the parties view as materially controverted at the close of the evidence, just as the process of settling jury instructions serves to frame issues for decision by the fact finder in the jury trial setting. Second, [Code of Civil Procedure] section 634 requires that any omissions or ambiguities in the statement of decision must be 'brought to the attention of the trial court either prior to entry of judgment or in conjunction with' a new trial motion ([Code Civ. Proc.,] § 657) or a motion to vacate the judgment ([Code Civ. Proc.,] § 663), thus allowing the court to respond to objections before the taking of an appeal. The second step is not a substitute for the first. Objections are germane only as to issues framed as materially controverted under [Code of Civil Procedure] section 632.

"For the doctrine of implied findings to be disabled on appeal, both steps of the two-step procedure under [Code of Civil Procedure] section 632 and 634 must be followed. [Citation.] Where a party fails to 'specify . . . controverted issues' or otherwise 'make proposals as to the content' of a statement of decision under [Code of Civil Procedure] section 632 (forcing the trial court to guess at what issues remain live during preparation of the statement of decision), or where a party complies with [Code of Civil Procedure] section 632 but fails to object under [Code of Civil Procedure] section 634 (depriving the trial court of the opportunity to clarify or supplement its statement of

decision before losing jurisdiction), objections to the adequacy of a statement of decision may be deemed waived on appeal. [Citation.] Because either procedural defect impedes the trial court's ability to fulfill its duty under [Code of Civil Procedure] section 632 and potentially undermines the effectiveness of any statement of decision it prepares as a tool of appellate review, strict adherence to both steps of the process is necessary before we will reverse the presumption of correctness generally accorded trial court judgments on appeal.

"Even where proper procedure under [Code of Civil Procedure] sections 632 and 634 has been followed punctiliously, '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' [Citations.] 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citation.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.] Thus, *a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.'* [Citation.] In addition, '[e]*ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.'*" (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981-983, italics added, fns. omitted.)

*B. Trial Court's Failure to Make Findings on Specified Issues of Fact.*

Hajj faults the trial court for failing to make findings on these issues of fact: (1) when performance was due under the contract; (2) whether Richardson was ready, willing, and able to perform; (3) whether Richardson breached the contract and when Hajj anticipatorily breached and repudiated the contract; (4) whether Hajj retracted her repudiation before performance was due; and (5) the factual and legal basis for the court's conclusion that Hajj did not deliver marketable title. Although we will address each of Hajj's issues, ultimately, the statement of decision resolved these collateral issues by finding that Hajj breached the agreement, thereby excusing further performance by Richardson.

Regarding the issue of when performance was due and whether Richardson was ready, willing, and able to perform, the trial court explained that escrow was unable to close on August 13, 2018, because the title company needed to establish that Hajj had clear title to convey. Although the statement of decision does not state a specific date when performance was due, it references Hajj's failure "to tender marketable title at the time the contract matured," and the need for Hajj to "either sign an interspousal transfer deed or take other action to clear title relative to her husband's potential interest, etc." and, thus, identifies the date as on or shortly after Schaefer's September 17, 2018 letter to Hajj concerning the interspousal transfer grant deed. According to Schaefer, whose testimony was "highly credible," "Abi-Abdallah, as Hajj's agent, was not cooperating with her as required by the escrow instructions . . . and . . . Hajj's refusal to cooperate . . . led to a delay in closing." Likewise, the court found Schaefer's testimony that "she would not

14

accept closing funds from [Richardson] until all documents required to close, including a policy of title insurance, were completed," sufficiently explained why Richardson, who was ready, willing, and able to perform, did not deposit the remaining $100,000 into escrow.**7**

Concerning when Hajj anticipatorily breached or repudiated the agreement and whether Richardson breached, the trial court noted that as of August 13, 2018, Hajj "openly stated, through her agent, that she believed the Agreement was 'null and void' because escrow had not timely closed, even though the evidence was that the close of escrow was delayed for reasons beyond the control of either the buyer or the seller or based on Hajj's own conduct." The court added that Schaefer "credibly testified that Abi-Abdallah, as Hajj's agent, was not cooperating with her as required by the escrow instructions . . . and that it was Hajj's refusal to cooperate that led to a delay in closing."

_____

**7** Hajj argues this case is factually similar to *Pittman v. Canham* (1992) 2 Cal.App.4th 556. Not so. In that case, Pittman contracted with Canham to purchase 56 acres of property. The contract specified that time was of the essence. The date set for close of escrow passed without either party tendering performance. Months later, Canham contracted to sell the property to a third party. (*Id*. at p. 558.) Pittman sued for specific performance. The trial court rejected the claim, finding that Canham had not waived time for performance, and Pittman had defaulted when he failed to tender the purchase money by the date set for close of escrow. (*Id*. at p. 559.) The appellate court affirmed, stating, "the failure of both parties to perform concurrent conditions does not leave the contract open for an indefinite period so that either party can tender performance at his leisure." (*Id*. at p. 559.) Instead, "[t]he failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform." (*Id*. at pp. 559-560.) Even if we assume that time was of the essence to the parties in the case before us, we cannot conclude that the mutual obligations of the parties could be unilaterally extinguished because escrow was not able to close on August 13, 2018. This was not a situation in which the simple exchange of deed for consideration was involved. Rather, the escrow required an interspousal transfer deed, which Hajj failed to provide.

15

Regarding the issue of whether Richardson breached the agreement, the court relied on Schaefer's testimony to conclude that it did not: "Shaefer also credibly testified that she told [Richardson] that she could not accept into escrow a deposit of the remaining funds until the title issue was cleared up by Hajj." Moreover, while Hajj "repeatedly asserted that both parties breached the Agreement," she "did not raise any of these other issues, seek to rescind performance, or take any steps to cancel the sale or escrow based on [Richardson's] conduct or alleged failures to, for example, 'verify' funds or remove appraisal contingencies. Hajj did not at any time, to anyone, claim that these issues constituted a breach of the Agreement or the [escrow] Instructions until she refused to provide the required information to escrow."

In determining whether Hajj retracted her repudiation prior to the time performance was due, the trial court concluded that she did not. The court explained that Hajj "left much of the responsibility for completing the sale to her husband and agent, Abi-Abdallah, who was unable to offer credible or consistent testimony at trial about what occurred." The court noted: "Abi-Abdallah contended that at all times, and long after the escrow was initially set to close, that he wanted . . . to close escrow and sell the property and that he was prepared to sign an interspousal transfer deed. He testified, though, that he could not sign the interspousal transfer deed because it did not state his correct legal name. He did admit to using that name, Tony. It appears he also used Tony Hajj or Tony Abi as a nickname. When asked why he could not have written his correct legal name on the deed, Abi-Abdallah stated, without any basis, that the deed had to be typed and also that he did not think he was allowed to alter the document. He also

16

testified that he could not correct the name himself and was at a loss about what to do with the deed. When asked why he did not contact escrow and ask that he be sent a deed with his correct legal name, he placed blame on realtor Stuart, who is now deceased. This explanation was undercut by Abi-Abdallah himself, who testified that he regularly returned documents directly to escrow and did not go through Stuart, and also that Stuart was angry at him and threatened to sue him because of his refusal to sign the deed and complete the sale."

As further support for its conclusion that Hajj did not retract her repudiation of the agreement, the trial court stated: "Abi-Abdallah also testified that he did not want to complete the sale because the buyer intended to use a different name to take title. Aside from the fact that this testimony was not consistent with other testimony by Abi-Abdallah regarding his willingness and strong desire to close escrow even after litigation in this case began, Abi-Abdallah could not explain why the name used by the buyer in taking title would alter his desire to enter into the sale, which was a cash transaction. At trial Abi-Abdallah simply stated that the closing would have been delayed by two months if the buyer took title under a name different than that stated on the Agreement. It is unclear why Abi-Abdallah believed that the closing would be delayed by this change, and at trial he could not articulate any basis for that belief. The theory at trial seems to have been that by designating a different entity to take title from the entity that executed the Agreement that this was a breach of the Agreement or a basis to rescind. This explanation strains credulity and was not supported by credible evidence." Thus, the court found that Hajj breached the agreement by failing "to tender marketable title at the

17

time the contract matured," and Richardson was "entitled to rescind, refuse to make additional payments, and to recover any amount paid."

The trial court rejected Hajj's postlitigation expression of a desire to complete the transaction as "not material" because "she still has not cleared up title marketability issues identified by the title company or located another title insurer willing to issue a policy even without an interspousal transfer deed or other document evidencing that Abi-Abdallah has no entitlement or interest in the property." Moreover, Hajj's postlitigation retraction of her repudiation did not cure her breach. (*Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 565 ["A repudiation is, by its inherent nature, irretrievable after an action is filed."].)

Finally, we disagree with Hajj's assertion that the trial court failed to state the factual and legal basis why she did not deliver marketable title. She asserts that her execution of the "notarized Grant Deed" that identified her as "'Katia Hajj, a married woman'" was sufficient to constitute marketable title. Not so. The court noted OCT's efforts "to establish that Hajj had clear title to convey e.g., . . . requesting Hajj either sign an interspousal transfer deed or take other action to clear title relative to her husband's potential interest, etc." Neither Hajj nor her husband furnished the required document. As the court observed: "[A]ll competent credible evidence was that Hajj refused to comply with escrow officer demands, all of which were reasonably necessary to ensure that escrow could transfer marketable title that was insured by a title insurer." For its legal basis, the court referenced Civil Code section 1689, subdivision (b), which provides: "A party to a contract may rescind the contract in the following cases: . . .

18

[¶] . . . [¶]  (2) If the consideration for the obligation of the rescinding party fails, in whole or in part, *through the fault of the party* as to whom he rescinds." (Italics added.) The court added: "Where a party to a contract fails to perform in accordance with the contract, or if the consideration he is required to give otherwise fails in whole or in part through his fault, the other party may invoke this failure as a basis for rescinding or terminating the contract, as long as the failure or refusal to perform constitutes such a material breach as to justify rescission or termination. (*Taliaferro v. Davis* (1963) 216 Cal. App. 2d 398, 412.)"  By failing to provide the interspousal transfer grant deed, Hajj failed to provide marketable title and, thus, failed to perform in accordance with the agreement.  (*Post v. Palpar*, *Inc.* (1960) 184 Cal.App.2d 676, 680 ["The failure to tender marketable title at the time the contract matures is a material breach of the contract . . . ."].)

To summarize, Hajj's criticism of the statement of decision is unfounded.  Given the trial court's findings on the material issues, any alleged failure to make findings on collateral or immaterial issues does not render the statement of decision deficient.  "If findings are made upon issues which determine a cause, other issues become immaterial and a failure to find thereon does not constitute prejudicial error."  (*Bealmear v. Smith* (1949) 91 Cal.App.2d 179, 181-182; see *Division of Labor Law Enforcement v. Transpacific Transportation Co*. (1977) 69 Cal.App.3d 268, 278, [same]; see also *Pacesetter Homes*, *Inc. v. Brodkin* (1970) 5 Cal.App.3d 206, 214 [Where the findings made by the trial court are sufficient to "defeat appellant's claim," other issues become "immaterial" and "any error as to other findings is not prejudicial"].)

19

*C.  Sufficiency of Evidence.*

Hajj contends the evidence is insufficient to establish that Richardson was able to perform, timely performed or tendered performance, or performed all obligations prior to her repudiation.  She further contends the evidence fails to support a finding that she did not retract her repudiation before performance was due.  We conclude substantial evidence supports the judgment.

1.  Richardson's ability to perform and tender of performance.

Hajj asserts that Richardson breached the agreement by failing to show that it was able to perform, that it timely tendered performance, and that it performed its obligations under the contract prior to her repudiation.  Regarding Richardson's ability to perform, Elicia identified the source of the funds ($100,000) necessary to purchase the property and Charles's ability to access them.  On September 27, 2018, anticipating that Hajj would be providing the documents Schaefer had requested for closing escrow, Charles tendered performance by requesting instructions to wire the funds into escrow. Nonetheless, Schaefer prevented him from doing so by suggesting that he wait until "we have all the documents from the Seller and the title company has approved them."  She explained that "[o]nce your funds are in escrow, if we are not able to close because of missing documents or anything else, we would not be able to release the money back to you without mutually agreed instructions from you AND the seller."  Schaefer also testified that they "don't request funds to be deposited in escrow unless we're in a

position to close."  Thus, the evidence shows that Richardson was able to perform and timely tendered performance.[8]

### 2. Richardson's obligations.

Hajj claims that Richardson failed to comply with the paragraphs 3I, 3J, and 19B of the agreement.  Paragraph 3I[9] requires Richardson to remove the appraisal contingency within 17 days of acceptance.  According to paragraph 3J, there was no loan contingency because the offer was "ALL CASH."  Paragraph 3J provides that "ALL CASH OFFER (if checked):  Buyer shall, within 7 (or [21]) Days After Acceptance, Deliver to Seller written verification of sufficient funds to close this transaction.  (If checked, . . . verification attached.)"  Although these two paragraphs provide short time deadlines for Richardson's responses, paragraph E states that the balance of the purchase price ($100,000) need only be deposited in escrow "within sufficient time to close."  Further, as the trial court noted, the evidence shows that "Hajj did not raise any of these other issues, seek to rescind performance, or take any steps to cancel the sale or escrow based on [Richardson's] conduct or alleged failures to, for example, 'verify' funds or

---

**8**  Hajj cites *Am-Cal Inv. Co. v. Sharlyn Estates, Inc*. (1967) 255 Cal.App.2d 526, 539-540, for the proposition that a "finding of the buyer's ability to pay the purchase price is required even when a tender of performance has been excused due to repudiation by the seller."  As previously stated, the evidence is sufficient to support a finding that Richardson was ready, willing, and able to purchase the property.

**9**  Paragraph 3I, in relevant part, provides:  "This Agreement, is . . . contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the specified purchase price.  If there is a loan contingency; Buyer's removal of the loan contingency shall be deemed removal of this appraisal contingency . . . .  If there is no loan contingency, Buyer shall, as specified in paragraph 19B(3), in writing remove the appraisal contingency or cancel this Agreement within 17 . . . Days After Acceptance."

remove appraisal contingencies.  Hajj did not at any time, or to anyone, claim that these issues constituted a breach of the Agreement or the [escrow] Instructions until she refused to provide the required information to escrow."

Paragraph 19B(1)-(3) states that Richardson has 21 days after acceptance "to complete all Buyer Investigations; approve all disclosures, reports and other applicable information, which Buyer receives from Seller; and approve all other matters affecting the Property (including lead-based paint and lead-based paint hazards as well as other information specified in paragraph 6 and insurability of Buyer and the Property)"; to "request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR)"; and to "[d]eliver to Seller either (i) a removal of the applicable contingency (C.A.R. Form CR), or (ii) a cancellation (C.A.R. Form CC) of this Agreement based upon a remaining contingency or Seller's failure to Deliver the specified items." However, paragraph 3D notes that Richardson is purchasing the property "'AS IS'" with no warranties from Hajj or the real estate agent, and paragraph 19B(4) provides:  "*Even after the end of the time specified in 19B(1) and before Seller cancels this Agreement*, if at all, pursuant to 19C, *Buyer retains the right to either (i) in writing remove remaining contingencies*, or (ii) cancel this Agreement based upon a remaining contingency or Sellers failure to Deliver the specified items.  Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to 19C(1)."  (Italics added.)

In short, Hajj's identified incidents of Richardson's alleged breach amount to nothing more than red herrings since other parts of the agreement extended the time of, excused, or nullified the requirement/condition prior to Hajj's repudiation of the contract.

### 3. Hajj's anticipatory breach of the Agreement.

Hajj claims there is no substantial evidence to support a finding that she did not retract her repudiation of the agreement before performance was due. She contends her performance was not due until Richardson deposited the remainder of the purchase price and executed the amended escrow instructions, and the "undisputed evidence establishes [she] tendered performance in November of 2018 but that [Richardson] rejected that tender." We reject her claim.

Schaefer testified that after August 18, 2018, she was told that Hajj intended to cancel the escrow. Subsequently, Hajj never cooperated in any efforts to close escrow and, after September 17, 2018, failed to execute and return the interspousal transfer grant deed that was required by OCT and necessary to transfer marketable title. On September 27, when Charles requested wiring instructions to deposit the funds necessary to complete Richardson's purchase of the property, Schaefer stopped him from doing so. Abi-Abdallah's words, coupled with Hajj's inactions, constituted an anticipatory breach of the Agreement. When Hajj further refused to respond to Richardson's written demand to close escrow, Richardson initiated this action on October 16, 2018. As previously stated, Hajj's postlitigation (Nov. 2018) retraction of her repudiation did not cure her breach. (*Gherman v. Colburn*, *supra*, 72 Cal.App.3d at p. 565 ["A repudiation is, by its inherent nature, irretrievable after an action is filed."].)

23

Notwithstanding the above, Hajj argues that she tendered performance on or about November 16, 2018, when Abi-Abdallah spoke with the mediator at least twice and tendered performance to Grabhorn, Richardson's attorney. Abi-Abdallah testified that, at all times from September 17 onward, he and Hajj remained ready, willing, and able to close escrow, and he was prepared to sign a properly drafted interspousal transfer grant deed. Hajj references Grabhorn's daily time records that evidence the conversation between Abi-Abdallah and Grabhorn, Grabhorn's conversation with Richardson, and Grabhorn's follow-up letter. However, Grabhorn's letter refutes Hajj's argument that she tendered performance. According to the letter dated November 20, 2018, Grabhorn called Hajj and spoke with Abi-Abdallah who explained that Hajj's "refusal to complete the sale required by the [Agreement] was based on the fact that the title insurance company was unable to certify clear title to the property within 30 days after the execution of the Agreement." Abi-Abdallah then "made a settlement proposal." Richardson rejected the settlement offer, made a counteroffer, and Abi-Abdallah "summarily rejected [it] on [Hajj's] behalf." Contrary to Hajj's assertion, her offer to settle the litigation initiated by Richardson does not constitute a retraction of her repudiation of the agreement. Thus, we conclude that the evidence supports a finding that Hajj failed to retract her anticipatory breach of the agreement before performance was due.

### D. Award of Attorney Fees.

Hajj contends the criteria for awarding attorney fees were not met because the trial court failed to make a finding as to what amount was actually incurred by Richardson,

24

and the award is excessive because a substantial part of the fees claimed was not reasonably necessary.

### 1. Applicable principles.

Civil Code section 1717 "governs attorney fees awards authorized by contract and incurred in litigating claims sounding in contract." (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 237.) "An action (or cause of action) is 'on a contract' for purposes of [Civil Code] section 1717 if (1) the action (or cause of action) 'involves' an agreement, in the sense that the action (or cause of action) arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement, and (2) the agreement contains an attorney fees clause." (*Id*. at pp. 241-242; accord, *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 427.) Courts liberally construe the term "on a contract" in Civil Code section 1717. (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, at p. 240.) We independently review a trial court's determination whether the criteria for awarding attorney fees has been met. (*Id*. at p. 237.)

### 2. Criteria for awarding fees and evidence of amount actually incurred.

Hajj faults the trial court for failing to make a finding as to what amount, if any, Richardson actually incurred. She also criticizes Grabhorn's declaration for failing to include the new engagement letter referenced in the compilation of his daily time entries. Thus, Hajj contends the award of attorney fees is improper because the motion for

25

attorney fees failed to establish the criteria and provide evidence of the amount Richardson actually incurred.  We disagree.

Here, Grabhorn submitted a declaration and a compilation of daily time entries of work performed.  He declared that (1) he was counsel of record for Richardson in this action; (2) he, his associates, and his paralegal at the law firm of Messina & Hankin, LLP, performed work in representing Richardson in its claims against Hajj asserted in this action; and (3) the fees being sought arose out of their representation of Richardson in this action.  Grabhorn's statements on these points are statements of fact—they describe the nature of his professional relationship with Richardson and the fees being sought—that are supported by his personal knowledge as counsel of record.  The statements adequately establish the legal services performed on Richardson's behalf pursuant to an attorney-client relationship, and that Richardson's right to fees grew out of that relationship.

Hajj contends that if Richardson was billed an amount less than the amount the trial court determined was reasonable, the fee award would be limited to that amount. (*Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 104.)  She asserts there is no evidence as to what Richardson was actually billed.  Contrary to Hajj's assertion, Grabhorn's declaration and the attached compilation of daily time entries sufficiently established Richardson's "incurred" attorney fees within the meaning of Civil Code section 1717, subdivision (a).  (*PLCM Group*, *Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097 (*Drexler*) [statutory attorney fees "incurred" are not restricted to *only* those fees a litigant actual pays or becomes liable to pay from his own assets; award of fees under Civil Code, § 1717 upheld]; *Musaelian v. Adams* (2009) 45 Cal.4th 512, 520

26

[attorney fees are "incurred" when "there was an attorney-client relationship, the attorney performed services on behalf of the client, and the attorney's right to fees grew out of the attorney-client relationship"]; see Code Civ. Proc., § 1033.5, subd. (c)(1) ["Costs are allowable if incurred, whether or not paid."].) Accordingly, Grabhorn's declaration reflects Richardson's "incurred" attorney fees in its action against Hajj.

We likewise reject Hajj's challenge to Grabhorn's failure to attach the new engagement letter referenced on February 23 and March 5, 2021, in the compilation of daily time entries. Hajj offers nothing more than speculation that the "2/23/21 and 3/5/21 entries on Exhibit B suggests that there was also a modification to [the] retainer agreement." According to Grabhorn, "a year into the case and shortly after [Richardson's motion for summary judgment (MSJ)] failed, Charles Richardson was unexpectedly diagnosed with terminal cancer. He died less than four weeks later. With that change in circumstances, [Richardson's] entire purpose for the transaction was effectively frustrated." Richardson's MSJ was heard on December 12, 2019. The operative pleadings state that on December 18, 2019, Elicia became acting sole manager of Richardson upon Charles's incapacitation. His death 10 days later made this change irrevocable. Thus, a more reasonable interpretation of the reference to a new engagement letter is Charles's death on December 28, 2019, necessitated adding Elicia's signature on the engagement letter.

Moreover, Richardson recovered its attorney fees under Civil Code section 1717, which provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be

27

awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." The statute does not, however, require a party seeking to prove the existence of an attorney-client relationship governed by a written agreement to do so by producing a copy of thereof. (*Ibid*.)

3. The award of attorney fees is not excessive.

Hajj asserts the award of attorney fees is excessive. Not so.

The lodestar method for calculating attorney fees applies to any statutory attorney fees award, unless the statute authorizing the award provides for another method of calculation. (*Glaviano v. Sacramento City Unified School Dist*. (2018) 22 Cal.App.5th 744, 750-751.) "Under the lodestar method, the trial court must first determine the lodestar figure—the reasonable hours spent multiplied by the reasonable hourly rate—based on a careful compilation of the time spent and reasonable hourly compensation of each attorney involved in the presentation of the case." (*Id*. at p. 751.) The moving party bears the burden of proof as to "reasonableness" of any fee claim. (Code Civ. Proc, § 1033.5, subd. (c).) The trial court is vested with broad authority to determine the amount of a reasonable fee. (*Drexler*, *supra*, 22 Cal.4th at p. 1095.) When a party is entitled to fees as costs pursuant to Civil Code sections 1717 and 1032, the trial court, in determining the reasonableness of such fees, may "'take all of the circumstances [of the case] into account.'" (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 683.) The moving

28

party's verified billing invoices are prima facie evidence that costs, expenses, and services listed were necessarily incurred. (*Id.* at p. 682.)

Here, the trial court determined the lodestar to be $165,637.50, based on finding that Grabhorn's hourly rate ($375) and billed hours (441.7) were reasonable. Hajj does not contest Grabhorn's hourly rate of $375; rather, she challenges the award of fees as excessive. Specifically, she argues that some of the fees claimed were not reasonably necessary because they reflect time spent pursuing Richardson's initial claim for specific performance and seeking summary judgment. She asserts that her offer to complete the transaction after October 24, 2018, would have allowed Richardson to purchase the property and avoid further legal fees. She further asserts that the issues were simple, trial was only 10 hours long, little discovery was conducted, Grabhorn's January 14, 2019 estimate of the legal fees associated with the prosecution of this case was only $65,000, the second amended complaint sought reasonable attorney fees of at least $45,000, and Richardson was only awarded $10,000 in damages. We agree that the issues were simple, that the trial was short, and that the damage award was only $10,000. However, we do not agree that the legal fees awarded by the trial court were excessive when "'all of the circumstances [of the case are taken] into account.'" (*Hadley v. Krepel*, *supra*, 167 Cal.App.3d at p. 683.)

The trial court possessed "great familiarity with this case. From the first Case Management Conference, [it] urged the parties to resolve the issues amicably because, per the parties themselves, [Richardson] wanted to buy the property and [Hajj] wanted to sell it." The court "repeatedly noted to all parties on the record throughout the litigation

29

that the costs of the litigation were increasing and that they could quickly outpace the damages sought in the operative complaint." Nonetheless, Hajj "actively litigated this case and drove up the costs of the litigation, whether intentionally or not . . . . [Thus, to deny recovery of the fees incurred due to Hajj's actions] would be unjust and would countenance [her] sharp practices in the underlying transaction and reward [her] often unsupportable actions during the litigation."

As the court observed, "it was evident at trial that [Hajj's] repeated claims that she wanted to sell the property and that she took steps to do so were false." For example, her offer to complete the transaction sometime in November 2018 was refuted by Grabhorn's letter dated November 20, 2018. In that letter, Grabhorn referenced his conversation with Abi-Abdallah, who explained why Hajj refused to complete the sale, but proposed a settlement of the action. Richardson rejected the settlement offer, made a counteroffer, and Abi-Abdallah "summarily rejected [it] on [Hajj's] behalf." No evidence was offered to support the claim that Hajj offered to complete the sale on the same terms and conditions outlined in the agreement. We agree with the trial court's assessment that "litigation was necessary given [Hajj's] recalcitrance throughout the litigation."

Nonetheless, Hajj argues that Richardson should not recover attorney fees for any legal work performed to prosecute its initial claim for specific performance because the operative pleadings sought rescission of the agreement and breach of contract damages. However, as the trial court noted, Charles's unexpected death changed the nature of the case and the damages sought.

30

Finally, Hajj argues "the award of attorney's fees should be considered in relationship to the damages awarded." She cites *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, but offers no analysis. Instead, she emphasizes the damages award was limited to $10,000. She overlooks the fact that the trial court that awarded those damages also determined a lodestar of $165,637.50 to be reasonable. "An experienced trial judge is in the best position to evaluate the value of professional services rendered in the trial court. We presume the fee approved by the trial court is reasonable. We will not disturb the trial court's judgment unless it is clearly wrong. The burden is on the objector to show error. [Citation.] Equitable principles inform this project." (*Id.* at pp. 743-744 [the appellate court refused to reverse the trial court's reduction of the amount of fees].)

In short, Hajj has failed to show the trial court erred in awarding $165,637.50 in attorney fees or that the award is excessive.

### III. DISPOSITION

The judgment is affirmed. Richardson is to recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

We concur:

MILLER_____
J.

CODRINGTON_____
J.

31